**WESTERN ATLAS INTERNATIONAL, INC., et al., Appellants,**

v.

**James WILSON, Appellee.**

**No. 12–94–00340–CV.**

Court of Appeals of Texas, Tyler.

Aug. 27, 1996.

Rehearing Overruled Oct. 30, 1996.

Charles H. Clark, Tyler, for appellant.

Richard O. McKennon, Dallas, Gregory A. Fraser, Tyler, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

RAMEY, Chief Justice.

This is an appeal by an employer from a judgment in a jury trial in favor of its employee, James Wilson ("Wilson"), in a retaliatory discharge case under the provisions of the Workmen's Compensation Law, TEX.REV. CIV.STAT.ANN. art. 8307c (Vernon Supp.1993) (repealed 1993) (current version at TEX.LAB. CODE ANN. §§ 451.001–451.003 (Vernon Supp. 1994)). The employer, Western Atlas International, Inc., d/b/a Atlas Wireline Services Western Geophysical Company of America, and Atlas Wireline Service, Division of Western Atlas International, Inc. ("Western"), asserts three points of error. We will reverse the trial court judgment and remand the case for a new trial.

Wilson was employed on a wireline crew for Western for approximately eight years before his back injury on January 1, 1989. His job title at the time he was injured was general operator. The nature of his work responsibilities required Wilson to lift and carry heavy equipment to and from each job.

Wilson retained an attorney to represent him in pursuing his back injury cause of action. His workmen's compensation claim was filed on February 13, 1989. On August 21, 1989, Wilson was given a release to return to work, but this release was admittedly not sufficient to allow him to return to his former job classification. Wilson underwent additional rehabilitation and secured a second release, dated September 8, 1989, and presented it to his supervisor, Jerry Wright ("Wright"). After Wright did not return Wilson to work, Wilson took a full-time but less-demanding job with another company,

Compulog. After learning of the new employment, Western then terminated Wilson and this suit followed. At the trial, the jury found that Western had discharged Wilson in violation of Article 8307c of the compensation law, and his damages were found in the amount of $104,000. The jury failed to find that Western had willfully or maliciously discharged Wilson.

■■■ Western's first two points of error assert that there was no evidence, or, alternatively, insufficient evidence, to support the jury's finding that Western had terminated or in any manner discriminated against Wilson because he had filed a workmen's compensation claim. When an appellant raises both legal and factual sufficiency challenges, we must examine the legal sufficiency point of error first. *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400, 401 (Tex.1981). When, as here, the appellant did not have the burden of proof at trial, a legal sufficiency point of error allows this court to examine only the evidence and inferences that tend to support the jury's findings while ignoring all evidence to the contrary. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex.1992); *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex.1992). If there is any probative evidence to support the jury's findings, the "no evidence" challenge must be overruled. *In re King's Estate*, 150 Tex. 662, 664, 244 S.W.2d 660, 661 (1951).

■■■ A claimant bringing an 8307c claim has the burden of establishing a causal link between the discharge from employment and his pursuit of a claim for workmen's compensation benefits. *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 658 (Tex.App.—El Paso 1990, writ denied). The plaintiff need not prove that the compensation claim was the sole cause, only that it contributed to the employer's decision to terminate him. *Mid–South Bottling Co. v. Cigainero*, 799 S.W.2d 385, 390 (Tex.App.—Texarkana 1990, writ denied). The jury was the sole judge of the credibility of the witnesses and the weight to be attached to their testimony. *Id.* As an intermediate appellate court, this Court is not a fact-finder and may not pass upon the credibility of the witnesses or substitute its judgment for that of the jury.

■■■ Here, there was legally sufficient evidence to support the jury's finding. The disputed issue is whether Wilson's supervisor, Smith, should have put Wilson back to work on September 7, 1989, when Wilson presented Smith with a release from his doctor, Dr. Steven Gaede, that stated:

> This is to certify that James E. Wilson has now recovered sufficiently to be able to return to regular work duties on 9–8–89. Restrictions: No lifting over 100 pounds. No lifting and carrying over 110 pounds as demonstrated capable on functional capacity exam.

The functional capacity test results reported in a release from The Neuro–Skeletal Center, dated September 7, 1989, reflected significant improvement from the same tests a month before; it stated that Wilson "is able to work in the heavy category with occasional work in the very heavy category" and that Wilson was released to return to his previous job but should work within the expressed functional capabilities.

Western's "Personal Status Report" for Wilson, dated October 23, 1989, stated that "employee is terminated—went to work at another job 10/23/89." On the next line, the following was stated: "been on W/C since 02/09/89."

From this evidence, we conclude that there was more than a scintilla of evidence from which the jury could have found that the pendency of the workmen's compensation claim was a contributing cause of Wilson's termination. Western's first point of error is overruled.

■■■ Western's second point presents a more difficult question. A different standard applies when the factual sufficiency of the evidence is challenged and the Appellant did not have the burden of proof on that issue at trial. In such a case, all of the evidence for and against the jury's findings is considered, and the court of appeals must affirm the verdict unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985). We thus review all of the evidence.

Wilson testified that he commenced working for Western in February 1981 as a junior operator. He progressed to senior operator and was a general operator at the time that he last worked for Western. As general operator his duties included, in addition to the supervision of his crew, rigging up the string of tools, hooking up the hoist unit and using it to pick up the tools and put them into the hole. After the job was completed, the tools and equipment were loaded back on the truck, taken back to the shop and cleaned up. On occasions, a general operator would be called upon to lift 150 to 175 pound tools. Wilson acknowledged that he would be required to lift as much as 150 pound equipment once every four to eight hours.

Wilson sustained a back injury while making a heavy lift on January 1, 1989. This was his first on-the-job injury; he continued to work briefly but went to Doctor Alexander Stock, a doctor retained by Western, two or three days later. Dr. Stock's diagnosis was a "slipped disk," and Wilson was placed under the therapy care of a neurosurgeon, Dr. Steven Gaede, who treated him for a year. Wilson hired an attorney to represent him in pursuing the workmen's compensation claim. His claim was filed on February 13, 1989 and, was settled after Wilson left Western's employ.

In the summer of 1989, Wilson obtained a release from Drs. Stock and Gaede to return to work and presented it to Wright, Wilson's supervisor. Wright required a functional assessment test. On August 1st and 2nd a functional capacity test was performed on Wilson by The Neuro–Skeletal Center in Tyler. In a "Release to Work" report, dated August 21, the Center concluded that Wilson performed well within the medium work category but that his capacities could be increased with additional work hardening.

He underwent several weeks of this therapy. The result was the second assessment, performed September 1, 1989, subsequent to which he was released to resume his previous job "but should work within his demonstrated functional capabilities." Wright concluded that because of the weight restrictions on his work, the assessment and the release were not 100% releases and he did not return Wilson to work at his former job.

Wilson requested to return to any job that was available in the company anywhere. Wilson was told that Western had no other jobs for him although inquiry of another job within the company worldwide was not made. It was admitted that if Wilson had presented Western with a full medical release, he would have been returned to his former job.

Within a month after presenting the second release, Wilson accepted employment at another business, Compulog, in Tyler. He had earlier applied unsuccessfully at other wireline companies in the area and then went to work as a Compulog mudlogger, a less strenuous job. Six months later, although he had sustained no additional physical injury, Wilson underwent back surgery for a ruptured disc. After recovering, Wilson has resumed work for other companies as a mudlogger.

Dr. Stock testified that he examined Wilson soon after he injured his back and released Wilson to return to his job on September 7, 1989. Stock said that if he had known that Wilson's job required lifting objects in excess of the weight restrictions imposed by Dr. Gaede, he would not have released him to return to that work and that Western acted prudently in refusing to do so.

Jerry Wright testified by deposition that he was the Tyler District Manager for Western when Wilson sought to return to work although he was not in the Tyler office before Wilson was injured. Wright said that Wilson requested a senior operator's position but none were available at that time. Because of the weight of the tools, Wilson would have been required to lift from 200 to 250 pounds. Wright denied that filing the workmen's compensation claim had anything to do with the decision not to put Wilson back to work at his old job in September 1989.

James Zander, a licensed insurance agent specializing in employer/employee insurance needs, testified as an expert that the workmen's compensation premium rates paid by an employer are increased more by the number and frequency of comp claims filed than by a few large claims. He said that the

continued employment of an individual who has previously filed a claim increases the compensation rates charged by insurance companies because statistical data show that if an employee has one claim, there is a higher probability of his filing subsequent claims; this is an element that affects the workmen's compensation insurance premium rate.

Dr. Steven Gaede testified by deposition. He said that Wilson had a serious underlying back problem and was not a likely candidate to return to very heavy labor. Gaede said that it was prudent for the employer to require a functional capacity test in this case before putting the man back to work. He testified that the return to work release showed that Wilson could return to his regular work duties on 9/8/89 if that work did not require him to lift over 100 pounds or carry over 110 pounds.

Steven Schroeder, Western's Manager of Manufacturing who was the Area Manager for Gulf Coast Operations for Western, Wright's superior, at the time that Wilson sought to return to his old job, testified that Wilson had been employed as a general operator and that he knew that Wilson would be required to lift 175 to 200 pounds or more. An employee restricted to lifting 100 or 110 pounds could not perform the job. Schroeder testified that the reference to "w/c" on the Personal Status Report, dated 10/23/89, does not mean that his comp claim was a contributing factor in his termination.

Ronald Hoffmaster, Western's Human Resources Manager, testified that the reference to "w/c" on the change of status form was a reminder to the payroll department that Wilson had been on inactive status, as opposed to leave. He stated that the form reflected that Wilson was terminated because he had taken a job with another employer.

■ This being an alleged "retaliatory discharge" case, our threshold inquiry is whether there is sufficient factual evidence

that Western "discharged" Wilson [1]; was his status as an employee changed by his employer or by his taking a new job? As we view the evidence, no mention was made by Wright or any other employee of Western during the September conversation, when Wilson presented his second release, that there was any consideration of terminating Wilson. Wilson likewise did not testify that any of Wright's comments suggested that he might be discharged from Western's employ.

We have carefully reviewed the record in an attempt to discern any action or testimony by Western or its employees from the date of that September conversation until October 23, the official date of termination, indicating that Wilson had been discharged or was being considered for termination by the company. On the other hand, Wilson's acceptance of full-time employment with another employer necessarily ended his employment relationship with Western. Wilson disagreed with Wright's decision not to put him back to work at his former job and he began searching for new employment after the September conversation with Wright. There is no indication that when Wilson accepted employment with Compulog that he expected to continue simultaneously as Western's employee. The overwhelming evidence reveals that Western did not discharge Wilson before he voluntarily became an employee of Compulog. We cannot escape the conclusion that the jury finding that Western retaliated against Wilson for filing a workmen's compensation claim *by discharging him* is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. Western's second point of error is sustained. It will not be necessary to address other asserted bases for Western's contention that the evidence is factually insufficient to support the jury's verdict.

■ By its third point of error, Western complains that the trial court erred in allowing the testimony of purported expert wit-

---

1. Article 8307c is not limited to "discharge"; the statute contemplates "a situation where an employer tries to avoid liability under the Act by retaliating against an employee in a manner other than outright discharge." *Castro v. U.S. Natural Resources, Inc.*, 880 S.W.2d 62, 65 (Tex. App.—San Antonio 1994, writ denied). The statute contemplates any manner of discrimination including discharge. Here, however, the case has been cast in its pleadings, the evidence and the jury questions as a discharge of the employee.

ness, Zander, on three grounds: (1) Zander was not qualified to render the opinions about which he testified; (2) Zander was erroneously allowed to testify that premium rates are affected by the number and frequency of claims although there was no evidence of the number and frequency of Western's claims; and (3) Zander was erroneously allowed to testify that employees with prior compensation claims are more likely to have subsequent claims thereby raising premium rates.

Zander testified that for the past eleven years he has been engaged in the insurance business primarily advising employers as to whether they should subscribe to the Texas Workmen's Compensation Law and how to achieve the lowest appropriate compensation insurance premium rates. His resume' was admitted without objection. The trial court has broad discretion in determining whether to admit expert testimony. *Connell v. Connell*, 889 S.W.2d 534, 545 (Tex. App.—San Antonio 1994, writ denied). There are no definite guidelines to determine whether a witness' education, experience, skill or training qualifies the witness as an expert. *James v. Hudgins*, 876 S.W.2d 418, 421 (Tex.App.—El Paso 1994, writ denied); *ITT Commercial Finance Corp. v. Riehn*, 796 S.W.2d 248, 250 (Tex.App.—Dallas 1990, no writ). The witness may express an opinion on a subject if the witness has specialized knowledge that will assist the trier of fact in understanding the evidence or in determining a fact in issue. *Potter v. Anthony Crane Rental of Texas, Inc.*, 896 S.W.2d 845, 852 (Tex.App.—Beaumont 1995, writ denied). Zander's experience in advising employees about managing their workmen's compensation premium rates was an area of expertise that could assist the jury in understanding the factors that determine compensation insurance premium rates. We hold that the trial court did not abuse its discretion in permitting Zander to testify as an expert witness.

Zander was allowed to testify that compensation premium rates are affected by the number and frequency of claims although there was no evidence that he was conversant with the number and frequency of West-ern's employees' claims. There can be little doubt that compensation premiums are affected by the number and frequency of claims that are filed under that coverage and we hold that allowing such testimony was not erroneous.

Finally, Western complains that Zander should not have been permitted to testify that employees with prior compensation claims are more likely to submit claims at a later date, which in turn would result in higher premium rates. Without offering supporting documentation for this testimony, Zander was allowed to testify that such employees are statistically more prone to file subsequent claims. The supporting factual data were not disclosed but the evidence rules do not require them to be offered. TEX.R.CIV.EVID. 705. Disclosure of this data may be developed on cross-examination. Rule 705. We hold that the trial court did not abuse its discretion in permitting Zander's testimony regarding the likelihood of subsequent claims by employees who have been previously injured. Western's third point of error is overruled.

The judgment of the trial court is **reversed** and **remanded** for a new trial.